**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **DAVID P.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:18-cv-64** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff David P. ("David") filed this action challenging the final decision of the

Commissioner of Social Security ("Commissioner") finding him not disabled and therefore

ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42

U.S.C. §§ 401–433. David alleges that the Administrative Law Judge ("ALJ") erred because: (1)

the ALJ failed to properly analyze medical evidence from the period after the date last insured,

resulting in an erroneous RFC finding; and (2) the ALJ failed to pose proper hypothetical

questions to the vocational expert.

This case is before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1)

(Dkt. No. 17). I conclude that substantial evidence supports the Commissioner's decision in all

respects. Accordingly, I **DENY** David's Motion for Summary Judgment (Dkt. No. 23) and

**GRANT** the Commissioner's Motion for Summary Judgment (Dkt. No. 27).

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

support the Commissioner's conclusion that David failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). "The threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

David analyzes the substantial evidence standard under the mistaken belief that simply identifying some evidence at odds with the ALJ's ultimate opinion on disability establishes that substantial evidence does not support the decision. This is too narrow an understanding of substantial evidence. The ALJ does not have to address every piece of inconsistent evidence. Smith v. Colvin, No. 1:12cv1247, 2015 WL 3505201, at *7 (M.D.N.C. June 3, 2015); see also Brittain v. Sullivan, 956 F.2d 1162 (4th Cir. 1992). Rather, the ALJ must author an opinion which shows how the evidence of record supports the decision made.

Attacking whether substantial evidence exists requires more than simply identifying medical records or statements that are inconsistent with the ALJ's findings. A claimant must

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

show that the ALJ used an improper legal standard, did not consider a relevant portion of the record, did not satisfy the duty of explanation, or the overwhelming weight of inconsistent evidence overcomes the very low substantial evidence standard. The Fourth Circuit has been clear that an ALJ's findings "as to any fact, if supported by substantial evidence, shall be conclusive." Hart v. Colvin, No. 5:169cv32, 2016 WL 8943299, at *3 (N.D.W. Va. Sept. 14, 2016) (quoting Walls v. Barnhart, 296 F. 3d 287, 290 (4th Cir. 2002)).

## **CLAIM HISTORY**

David filed for DIB on April 12, 2012, claiming disability due to multiple back problems, shoulder problems, chronic pain, high blood pressure, memory problems, nerve problems to lower extremities, depression, hip problems, weight problems, prior head injury, seizures, black outs, dizzy spells, anxiety, and sleep problems, with an alleged onset date of June 16, 2010. R. 112–13. David was 51 years old when he applied for DIB, making him 49 years old on his alleged onset date. R. 112. David's date last insured (DLI) was December 31, 2011; thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 17, 112; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied David's applications at the initial and reconsideration levels of administrative review. R. 112–34. ALJ Geraldine H. Page entered her first decision denying David's claim on September 26, 2014. R. 140–47. On February 25, 2016, the Appeals Council granted David's request for review and remanded the case to the ALJ for further consideration of David's right hand manipulative restrictions and other post-DLI evidence in the record that reasonably related to the period at issue. R. 154–55. On November 15, 2016, the ALJ held a second hearing to consider David's claim for DIB. R. 77–110. Counsel represented David at the hearing, which included testimony from vocational expert Asheley

Wells. R. 77. On April 5, 2017, the ALJ entered her decision analyzing David's claim under the familiar five-step process[3] and again denying his claim for DIB. R. 15–31.

The ALJ found that David did not engage in substantial gainful activity during the period of his alleged onset date (June 16, 2010[4]) to his date last insured (December 31, 2011). R. 17. The ALJ determined that David suffered from the severe impairments of degenerative disc disease of the lumbar spine and right shoulder dislocation and labral tear status post repair. R. 18. The ALJ determined that David's medically determinable impairments of hypertension, concussive syndrome, and gastroesophageal reflux disease (GERD) were not severe because they caused no more than a minimal limitation on David's ability to perform work activities. Id. Regarding references to a traumatic brain injury ("TBI"), the ALJ concluded that the record did not support a finding that the TBI was a medically determinable impairment, or that it met the criteria for neurocognitive disorders as of his DLI, because David had been infrequently diagnosed with a TBI and was referred for evaluation of his neurocognitive deficits in 2013, after the date last insured. Id. The ALJ determined that David's impairments, either individually or in combination, did not meet or medically equal a listed impairment, specifically listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine). R. 20–21. The ALJ concluded that David's medically determinable mental impairments of anxiety and depression were non-

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] David offered an amended alleged onset date of August 28, 2010, but the ALJ analyzed his claim using the original alleged onset date because the amended date did not result in greater limitations. R. 15, 358.

severe, considered singly and in combination. Id. The ALJ determined that the "paragraph B" criteria were not met, finding that David had mild limitation in understanding, remembering, or applying information; mild limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing himself. R. 18–20.

The ALJ concluded that David retained the residual functional capacity ("RFC") to perform light work. R. 21. For exertional limitations, the ALJ determined David could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for six hours and sit for six hours in an eight-hour workday; and occasionally push and pull with his upper and lower extremities. Id. He could never reach overhead and could occasionally reach in all other directions with his right arm. Id. For postural limitations, the ALJ determined David could never crawl or climb ladders, ropes, or scaffolds. Id. He could occasionally climb ramps and stairs, kneel, stoop, and crouch, and frequently balance. Id. For environmental limitations, David could never perform work on vibrating surfaces; must avoid all exposure to extreme cold, hazardous machinery, and work at unprotected heights; and could not tolerate excessively loud background noise in the immediate work environment, such as jackhammers or heavy traffic. Id.

Through his DLI, David was unable to perform his past relevant work as a carpenter. R. 29. Based on David's age, education, work experience, and RFC, the ALJ determined that David could perform jobs that exist in significant numbers in the regional and national economies, such as furniture rental clerk, gate guard, and usher. R. 29–30. Thus, the ALJ concluded that David was not disabled during the relevant period. R. 31. The Appeals Council denied David's request for review on December 18, 2017. R. 1–3.

## ANALYSIS

David alleges that the ALJ erred because: (1) the ALJ failed to properly analyze medical

evidence from the period after the date last insured, resulting in an erroneous RFC finding; and (2) the ALJ failed to pose proper hypothetical questions to the vocational expert.

**A. Medical History**

1. <u>Physical and Mental Impairments</u>

On June 16, 2010 (David's alleged onset date), David fell from a ten-foot scaffold at work, and struck his right shoulder on a two-by-four before landing in a sitting position. R. 450. David dislocated his shoulder, and a CT scan revealed an L-2 compression fracture in his spine. R. 446–47, 454, 457. One treatment note showed that David stated he hit his head too, but he reported no head pain or loss of consciousness. R. 439. Dr. Gary Simonds, a neurosurgeon, determined that the spinal fracture did not require surgery and prescribed a back brace and pain medication. R. 467, 470. David was also prescribed medication for anxiety he was feeling after the fall, although doctors reported him to be neurologically stable. R. 478–79, 487.

After some follow-up appointments, orthopedic surgeon Christopher John, M.D., diagnosed traumatic, recurrent anterior instability in David's right shoulder, with a classic history of repeated dislocation, for which David had stabilization surgery in September 2010. R. 1181. Dr. John recommended that David not work for one month, and prescribed physical therapy and pain medication. R. 1187. In November 2010, David was doing better, and by January 2011, David reported he was doing well and no longer on narcotics. R. 1201. In February 2011, Dr. John indicated that David could return to work from a shoulder standpoint, with a fifty-pound weight restriction and limited overhead work. R. 1205. At maximum medical improvement, Dr. John estimated that David would have only an eight percent extremity impairment. <u>Id.</u> David returned to Dr. John in May and June 2011 because he was anxious that he re-injured his shoulder, but Dr. John reported that the shoulder remained stable with no rotator cuff

impairment. R. 1209, 1215. Dr. John indicated that David would have a permanent work restriction of lifting only twenty-five pounds and no overhead use of his arm. R. 1215.

David continued follow-up care for his back with Dr. Simonds after the accident. A July 2010 x-ray showed no change in alignment or compression of the L-2 vertebra. Id. In August 2010, after complaints of pain, burning, and tingling radiating into his right leg, an MRI showed a slight increase in sub endplate sclerosis at L-2 with minimal increase in loss of vertebral body height, but his spine was otherwise stable. He was prescribed Gabapentin. R. 630, 1041. By November 2010, David was out of his back brace and his doctors reported that his lumbar fracture was stable. R. 637. Because of pain, they continued to prescribe pain medication and referred David to physical therapy, which he attended from October 2010 to April 2011. R. 582–98, 637. By February 2011, David was no longer on pain medication, but remained on Gabapentin and was overall doing better. R. 541, 643. In February and March 2011, David reported worsening back pain, and pain and numbness radiating down into his right leg and foot. R. 644, 646. A lumbar spine MRI showed the mild chronic compression fracture at L2, along with mild degenerative changes throughout the lumbar spine and mild bulging at each of the lumbar levels with relatively mild degrees of canal stenosis at each level. R. 554. Dr. Simonds determined that surgery would not help David, but referred him to PT again in July 2011. R. 605, 654. The therapists reported David had decreased pain and good tolerance for exercises, and was compliant with his treatment. R. 608–18. David reported that steroid injections also helped his pain. R. 610, 657. David had another MRI in December 2011, which showed mild multilevel spondylosis and small central disc extrusions at L4-L5 and L5-S1. R. 548, 1045.

During his initial neurosurgery appointments beginning in July 2010, David reported some memory impairment and anxiety. R. 625, 629, 633, 637. By December 2010, his doctors

reported he was having fewer cognitive delays, and he had no neurological deficits in February 2011. R. 641, 643. A March 2011 CT of his brain showed no significant or acute intracranial pathology, but a small area that was possibly hematoma over right frontal bone. R. 552.

David saw his primary care doctor, Elvis Ramon Pagan, M.D., in August 2010. R. 535. He had high blood pressure for which Dr. Pagan prescribed medication. R. 538, 541, 543. David also endorsed excess worrying at the time, and Dr. Pagan prescribed an SSRI for long-term use to treat his anxiety. R. 535, 538. In February 2011, Dr. Pagan observed that David had mild degenerative disc disease, but it did not warrant surgery. R. 541. David also reported that he had been having panic attacks since his accident, but his SSRI was helping. R. 542.

David's May 2012 pain questionnaire endorsed constant lower back, right leg, right shoulder, right hip, and left leg pain. R. 383. In his May 2012 function report, David reported that his wife has to remind him to shower and take his medication, but he otherwise maintained his personal care. R. 387. He did not prepare his own meals or cook because he could not stand for long enough, and he did not do chores. Id. Pain and stress affected his sleep. R. 388. He could go out alone, but did not drive frequently because of his alleged head injury and medication. R. 389. David alleged that his math and memory skills had deteriorated since his alleged onset date, but he reported still being able to count change and use a checkbook. R. 389–90. Ever since the accident, David alleged that he has been irritable, easily aggravated, and easily confused, and that he no longer socialized. R. 390–91.

At the November 2016 hearing, David alleged that he had been having blackouts since his accident, but he could not recall if he had told his doctors about them during the relevant period.[5] R. 84, 95. David testified that he is able to dress himself, but needs help with his shoes

---

[5] The only obvious indication in the record of a blackout comes from February 2015 (long after his DLI) when David went to the emergency room after having a syncope episode, which caused him to fall and lacerate his

and using the restroom. R. 88. David testified that he can make sandwiches and sometimes eggs and sausage for breakfast. R. 89. He stated that he becomes stiff after sitting for a couple of hours, but walks around the yard with the dog and tries to rake. R. 90. He testified he could do some grocery shopping and can do some chores, like the dishes. R. 92, 99. David testified that he actually does drive, but not when someone is in the car with him. R. 101. He testified that he has headaches every few days, and his ears have been ringing constantly since the accident. R. 96. He testified to having to lie down twice per day for roughly forty-five minutes because of his back. R. 97. David testified that he has problems reaching in most directions with his right arm because of his shoulder, but has no trouble gripping or manipulating things. R. 99, 102. He again stated that he has trouble sleeping because of his pain. R. 100. Regarding his mental state, David testified that he has had trouble remembering, concentrating, and focusing since the accident. R. 98. While David testified that he has trouble with his attention span, he also testified that he will spend two to three hours at a time on Facebook. R. 101. He testified that he could not get treatment because he owed too much in medical bills. R. 91.

2.  Medical Evidence from the Period After DLI

The Appeals Council remanded David's case following his appeal of the ALJ's first decision and instructed the ALJ to further consider evidence that reasonably relates to the period at issue, specifically referencing neurological records from after his DLI (December 31, 2011). R. 154–55.[6]

David's neurologist ordered re-imaging of David's head after he complained of

---

left eyebrow. R. 1110. He reported then that he had been having those episodes for only the last year. Id. His syncope was determined to be a result of atrial fibrillation. R. 1120.

[6] David alleges that the ALJ erred in failing to consider certain neurological evidence from after his DLI relating to his pain, anxiety, depression, and alleged TBI. Thus, I will discuss only that evidence.

intermittent altered mental status when, for example, he put the ketchup in the freezer. R. 715–16. A July 2012 CT scan showed a small supraorbital scalp contusion, but was otherwise negative. R. 717. In January 2013, William Wellborn, Ph.D., evaluated David for neurocognitive deficits associated with a potential TBI. David told the examiner that his initial accident resulted in a big knot on his head and that some teeth were knocked out (neither of which are reflected in the original emergency records). R. 723. David described symptoms such as losing his train of thought and trouble focusing. Id. During emotional functioning testing, David displayed the possibility that he was mildly exaggerating his complaints and problems. R. 725. Dr. Wellborn found some difficulties with perceptual motor speed and slowness in processing information, mostly due to pain, medications, depression, and anxiety, and possibly the TBI in question. R. 726. David had a significant level of depression, anxiety, and focus on physical problems, and Dr. Wellborn thought David should be referred for counseling. R. 727. David asked about why he was so forgetful, and Dr. Wellborn thought it was due to depression, pain, anxiety, and medications. Id. Ultimately, Dr. Wellborn drew no conclusions in his report regarding any non-exertional limitations that David had because of neurocognitive complaints.

   3.   Medical Opinion Evidence

   In July 2012, as part of the state agency's initial disability determination, Michael Hartman, M.D., reviewed the record and determined that David's severe medically determinable impairments included spine disorders, sprains and strains (all types), and osteoarthrosis and allied disorders. R. 116. As part of David's physical RFC evaluation, Dr. Hartman determined that David could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand or walk for six hours and sit for six hours in an eight-hour workday, with normal breaks; and would be limited to occasional pushing, pulling, and using hand controls with his right upper extremity.

R. 118. For postural limitations, Dr. Hartman determined that David could balance without limitation; frequently climb ramps or stairs; occasionally stoop, kneel, and crouch; and never crawl or climb ladders, ropes, or scaffolds. R. 118–19. For manipulative limitations, Dr. Hartman found no limitations with David's handling, fingering, or feeling, but he would be limited to occasional right overhead reaching. R. 119. Dr. Hartman determined David had no visual or communicative limitations. Id. For environmental limitations, Dr. Hartman found that David must avoid concentrated exposure to cold, wetness, vibration, and hazards, such as machinery and heights. R. 119–20. Dr. Hartman ultimately concluded that David would be capable of light work. R. 121. Julie Jennings, Ph.D., completed a psychiatric review technique evaluation for David's initial disability determination, but she did not find any medically determinable mental impairment and did not make a mental RFC evaluation. Dr. Jennings wrote, "The claimant alleges memory problems, depression and anxiety, however, he had to be found disabled between his alleged onset date of 06/16/10 and the date he was last insured . . . on 12/31/11. There was insufficient evidence to do so during this time frame." R. 117

In April 2013, as part of David's request for reconsideration of the state agency's disability determination, Bert Spetzler, M.D., evaluated the records and found the same medically determinable physical impairments as Dr. Hartman, including their severities. R. 129. Dr. Spetzler found the same exertional limitations as Dr. Hartman. R. 131. Dr. Spetzler modified the postural limitations and determined that David could balance without limitation; frequently climb ramps or stairs; and occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds. R. 131–32. Dr. Spetzler found the same manipulative and environmental limitations as Dr. Hartman, and also determined that David had no visual or communicative limitations. R. 132. Dr. Spetzler likewise concluded that David was capable of light work. R. 133. During

that same reconsideration, Jeanne Buyck, Ph.D., found that David had the medically determinable impairment of anxiety disorders, but determined that it was non-severe. R. 129. However, Dr. Buyck determined there was insufficient evidence to evaluate the "paragraph B" or "paragraph C" criteria. Id. Dr. Buyck wrote, "While [David] was [diagnosed] and [treated] for anxiety during the DLI time frame, there is insufficient evidence to evaluate his functional adaptation relative to the anxiety. There is no evidence of cognitive [limitations] during the DLI." Id.

In March 2014, Dr. Edwin Cruz, an independent medical expert, completed a medical interrogatory after reviewing David's medical records. R. 925. Dr. Cruz observed that David's L-2 lumbar spine fracture only required conservative treatment and a lumbar stabilizer brace. Id. Dr. Cruz noted David's history of depression and complaints of chronic pain, for which he takes medications. Id. Dr. Cruz observed that David's medical records suggested he had lumbar degenerative disc disease, but physical exams did not reveal any myopathy, muscle atrophy, or significant motor-sensory dysfunction or impairment; there was no abnormal nerve conduction study; and MRI imaging did not reveal any significant spinal cord impingement or nerve encroachment. Id. Dr. Cruz also observed that the records did not contain indications of muscle atrophy, paralysis, or loss of sensory or motor functions, and David was able to ambulate. Id. Dr. Cruz described the imaging studies in David's records, which revealed relatively mild findings. R. 926. Dr. Cruz noted that on January 21, 2013, David alleged a TBI, but a CT scan of his head on July 5, 2010, showed a small supraorbital scalp contusion but no other abnormality. Id.

Dr. Cruz concluded that David did not have any significant neurological impairment resulting from his June 2010 injury. Id. Dr. Cruz determined that David should be able to engage in gainful employment, including work that required mild to moderate exertion involving mild to

moderate workloads. Id. David should be able to sit, stand, and walk, with appropriate breaks, for reasonable periods of time. Id. He also should be able to do some limited repetitive type of work or moderate clerical work. Id.

Dr. Cruz completed a questionnaire with his opinion delineating David's functional capabilities. Dr. Cruz indicated that David would be able to lift and/or carry twenty-one to fifty pounds frequently; could sit, stand, and walk each for eight hours in an eight-hour workday; did not need to use a cane; could only occasionally reach overhead or reach in any direction with his right hand, and only occasionally push or pull with his right hand; never climb ladders or scaffolds but could frequently climbs stairs and ramps, balance, stoop, kneel, crouch, and crawl; could never be exposed to unprotected heights, and only frequently exposed to loud noises such as heavy traffic; and could attend to basic personal needs, such as shopping, traveling alone, walking and climbing stairs, preparing simple meals, and taking care of personal hygiene. R. 930–35.

### B.  Medical Evidence Considered by the ALJ

David argues that the ALJ erred in her consideration of the medical evidence because the record documents, including from outside the relevant period, showed David had symptoms of neurocognitive deficits, pain, depression, and anxiety well before his DLI. Pl.'s Br. at 7–10, Dkt. No. 24. The Commissioner counters that the ALJ thoroughly addressed the record, including the additional post-DLI evidence, and sufficiently explained why David's alleged mental impairments did not affect his ability to perform work-related tasks during the relevant period. Def.'s Br. at 13, Dkt. No. 28.

1. <u>Consideration of Relevant Evidence</u>

Medical evidence from after the DLI "generally is admissible in an SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre–DLI condition." <u>Bird v. Comm'r of Soc. Sec. Admin.</u>, 699 F.3d 337, 341 (4th Cir. 2012) (recognizing longstanding principle established in <u>Moore v. Finch</u>, 418 F.2d 1224 (4th Cir. 1969) and <u>Johnson v. Barnhart</u>, 434 F.3d 650 (4th Cir. 2005)). "[R]etrospective consideration of medical evidence is especially appropriate when corroborated by lay evidence." <u>Id.</u> at 342. In <u>Bird</u>, the Fourth Circuit held that the lower court erred in failing to consider multiple psychological assessments completed after the claimant's DLI. Those assessments showed that the claimant's symptoms of PTSD existed and impacted him long before his DLI in 2006; for example, one report at issue indicated that the claimant had suffered from PTSD since his return from the Vietnam War, and the claimant consistently changed jobs because his condition made it difficult for him to interact with others. <u>Id.</u> at 339, 341–42. The relevant inquiry remains, however, that to qualify for DIB, David must establish disability on or before his date last insured of December 31, 2011. <u>See</u> 42 U.S.C. § 423(a); <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 n.6 (4th Cir. 1972) (finding that the decision not to award disability benefits was supported by substantial evidence and noting that, while claimant was likely "now disabled," there was "no positive evidence of this until . . . six years after her insured status expired"). Ultimately, it is the province of the ALJ, and not the courts, to make a disability determination.

David specifies that the ALJ erred in her consideration of the 2013 neuropsychological evaluation from Dr. Wellborn. However, substantial evidence supports the ALJ's determination that David did not become disabled before his insurance status expired.

The ALJ provided an accurate and thorough discussion of the medical evidence of record from the relevant period. R. 23–26. The ALJ described David's initial fall, including that he stated he hit his head but did not lose consciousness. R. 23. The ALJ noted that David first mentioned his forgetfulness and memory issues at his July 2010 neurosurgery appointment. Id. He also complained of anxiety and nervousness at that time. Id. In August 2010, the ALJ stated that David again complained of anxiety, but his primary care doctor maintained David on Xanax and prescribed a long-term medication. R. 24. At a neurosurgery appointment in September 2010, the ALJ observed that David appeared a "bit" delayed with some memory impairment, but no other mental deficits were noted. Id. At a February 2011 neurosurgery appointment, David's neurological exam was unremarkable, and fewer cognitive delays were noted. R. 25. Later that month, he reported to his primary care doctor that he had been having panic attacks since the accident, and he remained on anxiety medication (although David reported that he did not need to take it daily). Id. The last record relating to potential mental health issues was of the brain CT from March 2011 showing a small extracranial soft tissue density that was thought to represent a small hematoma over the right frontal bone. Id. The ALJ accurately observed that no significant intracranial pathology was found. R. 26.

David correctly argues that the 2013 neuropsychological evaluation conducted after his DLI is linked to his pre-DLI condition because the evaluation itself references a potential TBI that David may have suffered in his initial accident. David is incorrect, however, in alleging that the ALJ failed to give retrospective consideration to that assessment, as the ALJ explicitly considered records after December 31, 2011.

The ALJ described that in June 2012, David endorsed some instances of altered mental status, but there were no deficits noted in his neurological exam. Id. In October 2012, David

presented as depressed, irritable, and rude, but his long-term memory was intact, he successfully completed most recall tests, and his attention and concentration were intact. R. 26–27. David was referred for a neurocognitive evaluation after complaining of pain, issues with memory and focus, and depression at that point. R. 26. The ALJ then described, in great detail, the January 2013 neurocognitive evaluation. She observed that David was slow in responding to questions and some tests took longer to perform, but he remained cooperative. R. 27. She wrote that Dr. Wellborn assessed a TBI, pain disorder, mood disorder, and anxiety disorder. Id. The ALJ accurately noted that the testing revealed only some difficulties in perceptual motor speed and slowness in processing information, which Dr. Wellborn attributed to pain, medications, anxiety, and depression. Id. She also observed that Dr. Wellborn indicated that David's symptoms could be related to a TBI, but David's forgetfulness was likely due to a combination of traumatic pain, anxiety and depression, and medications. Id.

Following her protracted discussion of David's questionnaires, testimony, and medical records, the ALJ wrote, "[T]here are no persuasive opinions in the record that suggest greater physical or mental limitations than those accounted for in the [RFC]." R. 28. The ALJ explained that she gave only some weight to the state psychological consultants because they found insufficient evidence of mental impairment, but the ALJ accurately concluded that the "expanded record supports the existence of a mental health impairment." Id. The ALJ explained, however, that David experienced no more than mild limitation in any domain of mental functioning. Id. In evaluating the "paragraph B" criteria, the ALJ found that David had mild limitation in understanding, remembering, or applying information. She explained that David complained of some memory deficits in his May 2012 function report, but the record prior to his DLI showed no serious deficits in long-term or short-term memories, insight, or judgment. R. 18. David was

able to give his medical history to his doctors; alleged he could not do chores because of pain specifically; and described no issues with understanding, remembering, or applying information. Id. The ALJ observed that David's treating neurologist noted some issues with memory, but also reported that they improved after time. Id. Additionally, the ALJ explicitly considered the January 2013 evaluation, explaining that few deficits were found during that examination, and the examiner reported that David's pain and medications could account for any of his deficits. Id. The ALJ also found mild limitation in concentrating, persisting, or maintaining pace. The ALJ again recognized that David complained of some concentration deficits in his May 2012 report, but his treating physicians did not describe David to be overly distractible or slow. R. 19. She repeated that David's treating neurologist noted he appeared slow at times, but reported that his symptoms improved over time. Id. The ALJ also repeated the findings from the January 2013 evaluation. Id. In light of the ALJ's thorough review of David's questionnaires, testimony, and medical records, along with her lengthy explanations of her conclusions, substantial evidence supports the ALJ's determinations that David's anxiety and depression did not have a severe impact on his ability to do work-related tasks during the relevant period.[7]

David contends that no reasonable person could conclude that the January 2013 evaluation showed only a few deficits. However, the ALJ provided an accurate and holistic summary of the findings. The objective testing produced twenty-two findings across six areas of functioning, and David's scored at the average level or higher in all findings except for two. R. 724–25. Dr. Wellborn determined that David had "some difficulties with perceptual motor speed and a slowness in processing information," and concluded that those were "due to pain,

_____

[7] Substantial evidence also supports the ALJ's decision to reject TBI as a medically determinable impairment. She accurately noted that David was infrequently diagnosed with the condition (and, even when he was, the TBI was usually referred to only as "possible"). R. 18.

medications, depression, and anxiety, and *possibly* the traumatic brain injury." R. 726 (emphasis added). David had significant levels of anxiety and depression, but Dr. Wellborn thought the best courses of action would be to remain on medications and enter counseling. R. 727. Dr. Wellborn did not comment on any work-related limitations that David would have as a result of his conditions. The ALJ accurately and concisely explained, "[W]hile the claimant testified to cognitive deficits secondary to a traumatic brain injury, when seen by a specialist, any limitations were not attributed directly to a head injury. Moreover, relatively few deficits were noted on examination and would not cause more than a mild limitation." R. 29 (citing the January 2013 assessment). This explanation provides a logical bridge that I am able to follow from the ALJ's consideration of the 2013 assessment to her conclusion that David's mental condition did not render him disabled before his DLI.

    2. <u>Assessment of David's Testimony</u>

David also contends that his testimony sufficiently corroborates the January 2013 evaluation. However, the ALJ explained that David testified to greater limitations than determined in her decision, and wrote, "[W]hile his testimony may be supported by the current evidence, the record prior to the date last insured does not corroborate his allegations." R. 28.

David's subjective allegations of his disabling pain, symptoms, and impairments are not conclusive on their own; rather, subjective complaints and statements of symptoms, like all other evidence of disability, are considered in the context of the record as a whole. 20 C.F.R. §§ 404.1529, 416.929 (2017). The ALJ must determine the consistency of the claimant's subjective allegations by evaluating the claimant's medical history, medical signs, laboratory findings, objective medical evidence of pain, and "any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the

pain, and any medical treatment taken to alleviate it." Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996) (citations omitted). If a claimant's statements are inconsistent with other evidence, the ALJ may find that the claimant's statements are overall outweighed by that other evidence after weighing both accordingly. See SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).

The ALJ found that the objective medical records demonstrated David did not have limitations that would render him disabled. For example, the ALJ explained that David's treating orthopedist released him to a range of light work, who also noted David regained good strength with only mild motion deficits. R. 29. Additionally, notes from David's neurosurgeon detailed "relatively mild findings" from imaging studies and reported that David had good improvement with injections. Id. As discussed, the ALJ accurately explained the limited findings from the January 2013 assessment. Id. Thus, the ALJ demonstrated that the objective medical evidence did not demonstrate that David was completely disabled during the relevant period.

Additionally, in outlining David's questionnaires and testimony, the ALJ displayed how David's statements frequently conflicted with one another. In her decision, the ALJ explained that David never alleged any changes or new conditions from his initial disability application, but endorsed worsening depression when he requested a hearing before the ALJ in March 2013—more than a year after his DLI. R. 22. The ALJ recognized David's complaints of constant pain, but explained that David was able to maintain his personal care, except for needing occasional reminders for showering and medication. Id. She stated he could not stand long enough to cook, but David later testified that he occasionally cooked eggs and sausage for breakfast and was able to make himself sandwiches. R. 22, 89. The ALJ also described that David could not do chores because of pain, although he later testified to walking the dog around the yard and doing yard work and dishes. R. 22, 90. David reported rarely driving and that he did

not do any shopping, but he was able to go out on his own and in fact later testified to both driving and doing some shopping. R. 22, 92, 101. In his report, David stated he could pay attention for no more than five to ten minutes, had trouble finishing what he started, and had memory problems. R. 22. David also testified that he had problems with memory and concentration, but he also described being able to spend extended periods of time on Facebook, and he could count money and manage a checkbook. R. 22–23. David testified to experiencing blackouts since his accident, but the ALJ correctly noted that he did not see a doctor for this symptom during the relevant period. R. 22. Finally, the ALJ noted the many times that David was using more pain medication than prescribed, or when doctors refused to give him more pain medication because his condition should not be causing pain requiring narcotics. R. 23–26.

A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). David's overall argument amounts to a disagreement with the ALJ's assessment, but I give the ALJ's well-reasoned finding great weight and find that substantial evidence supports the ALJ's determination that David did not have severe mental impairments that precluded him from work-related duties before the DLI. There were sporadic mentions of memory impairment during the relevant time period, most of which were accompanied by normal neurological findings. The post-DLI examination showed that David's impairments were likely the result of a combination of anxiety, depression, pain, and medication, and it did not conclude that a TBI caused the symptoms (much less provide a definitive diagnosis of a TBI). David was on anxiety medication during the relevant period, which he reported was helpful and, at one point, he reported no longer requiring his Xanax daily. Finally, the ALJ was entitled find David's statements as less than

credible, as his statements conflicted throughout the record and were not entirely supported by objective medical evidence.

### C. Hypothetical Questions

David alleges that the ALJ erred in the questions she posed to the vocational expert at the administrative hearing because she failed to include non-exertional limitations produced by pain, depression, anxiety, or TBI. Pl.'s Br. at 11, Dkt. No. 24. He asserts that the ALJ also failed to assess any limitations associated with concentration, persistence, or pace, particularly as impacted by pain. Id. The Commissioner counters that the ALJ adequately explained why the RFC accounted for David's impairments, and the record evidence fails to demonstrate that David had any additional work-related mental impairments before his DLI. Def.'s Br. at 17, Dkt. No. 28.

The ALJ has the responsibility to address the evidence of record that supports her conclusions, and to ensure that the questions presented to the vocational expert include all of the limitations set forth in the RFC. See Panna v. Colvin, No. 1:15cv229, 2015 WL 5714403, at *3 (W.D.N.C. Aug. 31, 2015) (remanding because "the ALJ failed to address [the claimant's] limitations in social functioning or explain why these limitations in social functioning did not translate to work related limitations in Plaintiff's RFC" like what is required by Mascio in concentration, persistence or pace cases). In Mascio v. Colvin, the Fourth Circuit held that an ALJ does not generally account for a claimant's limitations in concentration, persistence, and pace by restricting the claimant to simple, routine tasks, or unskilled work. 780 F.3d 632 (4th Cir. 2015). The court noted, however, that the ALJ may find that the concentration, persistence, or pace limitation would not affect a claimant's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. Id.; see also

Hutton v. Colvin, No. 2:14-cv-63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015). The court found error in Mascio because the ALJ did not explain why Mascio's moderate limitation in concentration, persistence, or pace did not translate into a limitation in his RFC.

Thus, Mascio reiterates the long-held proposition that substantial evidence in the record must support the limitations contained in the RFC and those limitations must be included in the hypothetical questions presented to the vocational expert. The Mascio decision does not broadly dictate that a claimant's moderate impairment[8] in concentration, persistence, or pace must always translate into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty of explanation to adequately review the evidence and explain the disability decision. The ALJ has the responsibility to address the evidence of record that supports her conclusions, and to ensure that the hypothetical questions posed to the vocational expert include all of the RFC's limitations.

When presenting hypothetical questions to the vocational expert during the administrative hearing, the ALJ described a hypothetical individual who performed work requiring:

> lifting and carrying no more than 20 pounds occasionally, 10 pounds frequently, standing and walking no more than six hours in an eight-hour day, sitting for no more than six hours in an eight-hour day, pushing and pulling occasionally with the upper and lower extremities, no reaching overhead with the right upper extremity, occasional all other reaching with the right upper extremity, never crawling, climbing ladders, ropes, scaffolds, or working on vibrating surfaces, occasional climbing ramps and stairs, kneeling, stooping, [and] crouching, frequent balancing[,] avoid[ing] all exposures to extreme cold and all hazardous machinery [and] work at unprotected heights, [and] no excessively loud background noise in the immediate work environment, such as jackhammers or heavy traffic.

R. 105. The vocational expert testified that such an individual of David's age, education, and past work experience could perform light-level jobs in the national economy, such as furniture rental clerk, gate guard, and usher. Id.

---

[8] At the outset, David's case is readily distinguishable from Mascio because the ALJ here found only mild limitation in his abilities to concentrate, persist, and maintain pace. R. 19.

The ALJ explicitly indicated in her decision that David's back and right shoulder injuries required the postural, manipulative, and environmental limitations. The ALJ gave great weight to the state agency consultants in that regard because of their findings' consistency with the objective medical evidence, and thus imposed similar limitations. R. 28. The ALJ also explained that David's radicular pain in his legs required a limitation for foot controls. Id. Based on the opinions of other providers, including Drs. John and Cruz, the ALJ imposed strenuous reaching limitations, including no overhead reaching and occasional reaching in all other directions. Id.

Furthermore, as discussed, substantial evidence supports the ALJ's finding that David had no more than mild limitation in concentrating, persisting, and maintaining pace during the relevant period. David alleges that the ALJ did not take into account his allegations of pain, but the ALJ referenced numerous treatment notes in which David was not appropriately using his pain medication, or he was refused pain medication because his condition should not cause his alleged amount of pain. The ALJ provided sufficient explanations for why David's alleged TBI was not a medically determinable impairment, and why his anxiety and depression did not cause more than minimal limitation in David's ability to perform basic mental work activities.

Accordingly, the ALJ's hypothetical questions to the vocational expert were not deficient, as they reflected the limitations and impairments that were supported by the objective evidence, and the ALJ provided the requisite explanation for those limitations. Unlike in Mascio, the court here is not left to guess at the ALJ's decision-making process, including with regards to her not including any additional mental limitations in her hypothetical questions. See Gautreau v. Colvin, No. 2:15CV81, 2016 WL 1314314, at *9–10 (E.D. Va. Feb. 26, 2016), report and recommendation adopted, No. 2:15CV81, 2016 WL 1298122 (E.D. Va. Mar. 31, 2016), aff'd sub nom. Gautreau v. Berryhill, No. 16-1628, 2017 WL 1423297 (4th Cir. Apr. 21, 2017).

Accordingly, I found no error in the ALJ's hypothetical questions to the vocational expert.

## CONCLUSION

For the foregoing reasons, I **DENY** David's Motion for Summary Judgment, **GRANT** the Commissioner's Motion for Summary Judgment, and **DISMISS** this case from the Court's docket.

Entered:  May 29, 2019

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge